IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 7:12-CV-104-D

DEANNA M. LOVE-MOORE,    )
                          )
   Plaintiff,          )
                          )
v.                        )
                          )      **MEMORANDUM &**
                          )      **RECOMMENDATION**
CAROLYN W. COLVIN,        )
Acting Commissioner of Social )
Security,                 )
                          )
   Defendant.          )
_____ )

This matter is before the Court upon the parties' Motions for Judgment on the Pleadings. DE's-25 & 32. The time for filing any responses or replies has expired, and, therefore, the motions are now ripe for adjudication. Pursuant to 28 U.S.C. § 636(b)(1), they have been referred to the undersigned for the entry of a Memorandum and Recommendation.

For the following reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-25) be DENIED, and that Defendant's Motion for Judgment on the Pleadings (DE-32) be GRANTED.

## STATEMENT OF THE CASE

Plaintiff filed concurrent applications for supplemental security income and disability insurance benefits on December 22, 2006, alleging disability beginning September 4, 2002. Tr. 13. Her claim was denied initially and upon reconsideration. *Id.* A hearing was held before an Administrative Law Judge ("ALJ") who determined that Plaintiff was not disabled in a decision dated March 12, 2010. *Id.* at 13-22. The Social Security Administration's Office of Disability

Adjudication and Review denied Plaintiff's request for review on February 29, 2012, rendering the ALJ's determination as Defendant's final decision. *Id.* at 1. Plaintiff filed the instant action on May 23, 2012. DE-1.

## STANDARD OF REVIEW

This Court is authorized to review Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive….

42 U.S.C. § 405(g). "Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, . . . [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute . . . [its] judgment for that of the Secretary." *Craig*, 76 F.3d at 589. Thus, this Court's review is limited to determining whether Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

## SUMMARY OF THE RECORD

The Social Security Administration has promulgated the following regulations establishing a sequential evaluation process that must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b).[1] If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App. I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

*Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ followed the sequential evaluation in this case. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 4, 2002. Tr. 15. At step two, the ALJ found that Plaintiff had the following severe impairment: ruptured right Achilles tendon. *Id.* The ALJ also found at step two that Plaintiff's depression and anxiety, axillary abscesses, insomnia, anemia, hyperlipidemia, B12 deficiency, and restless leg syndrome were non-severe. *Id.* at 16-18. In addition, the ALJ found that the chest wall pain described by Plaintiff was not a medically determinable impairment. *Id.*

---

[1] The five step analysis applies to both supplemental security income and disability insurance benefits. *Compare* 20 C.F.R. Part 404 subpart P *with id.* Part 416 subpart I. For simplicity, only 20 C.F.R. Part 404, which governs disability insurance benefits, is cited herein.

at 16-17. The ALJ then determined that Plaintiff did not have an impairment that met or

medically equaled one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. *Id.*

at 18. Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC")[2] to

perform sedentary work, with some additional limitations. *Id*. at 18. Specifically, the ALJ found

that Plaintiff could:

> perform sedentary work (lifting and carrying 10 pounds occasionally and
> standing and/or walking 2 hours in an 8-hour workday . . . .), except that
> she is limited to only occasional climbing, balancing, stooping, kneeling,
> crouching, and crawling.

*Id.* The ALJ then found that Plaintiff was unable to perform any past relevant work. *Id*. at 21.

But based on the testimony of a vocational expert, the ALJ found that there were jobs that

existed in significant numbers in the national economy that Plaintiff could perform. *Id*. at 21-22.

Accordingly, the ALJ determined that Plaintiff had not been under a disability during the

relevant time period. *Id*. at 22.

Plaintiff asserts that the ALJ erred in several respects. First, Plaintiff argues that the ALJ

erred in determining the weight given to various opinions, including her treating provider.

Second, Plaintiff contends that the ALJ disregarded evidence in finding that her depression was

non-severe. Third, Plaintiff argues that the ALJ erroneously discounted her credibility in

determining her RFC, and that substantial evidence does not support his RFC determination.

Finally, Plaintiff takes issue with the hypothetical questions the ALJ posed to the vocational

---

[2] An individual's RFC is what that person can still do despite physical and mental impairments. 20
C.F.R. § 404.1545(a).

expert at the administrative hearing. However Plaintiff styles these arguments, upon review,[3] each essentially boils down to the contention that the ALJ incorrectly weighed the evidence before him. Here, the ALJ's findings were accompanied by a thorough review and assessment of the entire record. This "assessment . . . provides a backdrop for the ALJ's evaluation[s] . . . and provides insight into [them]." *Worden v. Astrue*, No. 4:11-CV-88-D, 2012 WL 2919923, at *5 (E.D.N.C. May 29, 2012), *adopted by* 2012 WL 2920289 (E.D.N.C. Jul 17, 2012). Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. *Craig*, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, her claims are without merit. As discussed in more detail below, each of the ALJ's findings was supported by substantial evidence.

## Plaintiff's Reported Impairments, Limitations, and Activities

In her initial application for benefits, Plaintiff claimed the following disabilities: "insomnia, anxiety disorders, [and] stab wound to chest." Tr. 276. She stated that the stab wound caused her pain during strenuous activity and that she "stay[ed] tired all the time" because the insomnia medication she was taking did not work. *Id.* In her request for reconsideration, she reported her complete Achilles rupture and the new limitations due to that injury. Tr. 68.

---

[3] The undersigned has carefully endeavored to untangle the oft-convoluted arguments set forward in Plaintiff's brief and discern Plaintiff's underlying objections. While this Court is mindful of the demands placed upon busy counsel, it suggests that in the future, counsel would benefit from greater care in editing the proffered arguments.

At the hearing, Plaintiff testified that she could walk even with the Achilles injury, but that it was "uncomfortable." Tr. 154. She also testified that the cysts under her arms limited her ability to pick up and carry things. *Id.*

As to her insomnia, Plaintiff stated that she takes Ambien just before going to bed. Tr. 160. Plaintiff had insomnia back when she worked full time, Tr. 161, but once she was on prescription medication, it improved. Tr. 161. Plaintiff also reported that her insomnia medication becomes less effective the longer she is on it. Tr. 156. She said that she "can still have some nights" where she is "still up . . . just looking at the clock," and that four or five hours of sleep is "great" if she can get it. *Id.* According to Plaintiff, the lack of sleep makes her feel weak and tired. Tr. 162. She added that she cannot do work because the insomnia makes her depressed. Tr. 165.

Plaintiff takes Zoloft for her depression and Requil for her restless leg syndrome, each once per day. Tr. 162. She testified that the Zoloft did not help, even though they upped her prescription from 50 to 100 mg. *Id.* Finally, Plaintiff reiterated that she takes pain medication twice per day for the Achilles injury. Tr. 166. Although Plaintiff stated her medicine makes her dizzy to the point that she needs to rest for 20 minutes after taking her medication, which medication causes this was not specified. Tr. 154-55. Plaintiff at one point testified that it was the pain medication that made her "see[] … little dots." Tr. 169. Yet she also stated that "each time" she takes any medication, four or five times per day, she sees dots. Tr. 170-171. Plaintiff also testified that her medication makes her feel weak and tired. Tr. 171.

Plaintiff has not worked full time since 2000 or 2001. Tr. 158. She alleges a disability onset date of September 4, 2002. Tr. 13. From 2003 until 2009, Plaintiff worked as a bus

6

monitor for between 2-4 hours a day, five days a week.[4] Tr. 151, 422. Plaintiff left this part-time

position due to cutbacks rather than due to her impairments. Tr. 151. As for activities around the

house, Plaintiff stated that she can cook and wash clothes, Tr. 172, and can sweep and mop,

albeit "not without problems" due to her Achilles pain. Tr. 173.

**Medical Records**

<u>Chest Pain</u>[5]

In March 1989, Plaintiff "got cut" on her right side and "didn't think it was bad enough to

see a doctor." Tr. 359. She sought medical attention, however, when it started hurting worse. *Id.*

Plaintiff went to the hospital in May 1989 after she was physically assaulted by her husband and

reported at that time that he had stabbed and cut her in the past. Tr. 360. In the medical records

for all the intervening years between 1989 and the present, no complaints of chest pain or other

limitations from this injury are readily apparent. *E.g.*, Tr. 332-33 (visits for fractured toe and

upper respiratory infection, no other complaints noted). The only chest pain noted in Plaintiff's

medical records occurred following a car accident in May 1993, Tr. 393, and again following

another car accident and bronchitis in February 2007. Tr. 427, 410-12, 557. She was prescribed

Percocet for pain following the accident. Tr. 457. On other visits, Plaintiff routinely reported to

her doctors that she did not have any chest pain. *E.g.*, Tr. 134, 323. The only description of the

purported lasting pain and symptoms of the stab wound in the records is Plaintiff's complaint to

the consulting physicians over the course of her disability application process. Tr. 403-06, 420-

---

[4]     The ALJ found that this did not rise to the level of substantial gainful activity. Tr. 15.

[5]     Plaintiff did not testify regarding chest wall pain, but because she listed it on her application for
benefits and the ALJ considered it in his decision, the pertinent facts are summarized.

7

25. Moreover, Plaintiff's treating provider did not mention it in his statement regarding Plaintiff's work-related limitations. *See* Tr. 549-554.

Axillary Abscesses

Axillary abscesses are noted only in the medical source statement completed by the certified physician assistant who treated Plaintiff. Tr. 551. Neither cysts nor abscesses are mentioned in Plaintiff's treatment records. The only discussion at all of Plaintiff's axillary area during check-ups consists of notes that no swelling of her lymph nodes (axillary lymphadenopathy)[6] was observed. *E.g.*, Tr. 560.

Achilles Tendon Injury

On March 13, 2008, Plaintiff fell and injured her right ankle, reporting 10/10 on the pain scale. Tr. 568. She continued to have pain and swelling from the ankle injury as of April 28, 2008, so an MRI was scheduled. Tr. 570. The MRI detected a ruptured Achilles tendon. Tr. 571. As of July 28, 2008, Plaintiff was still deciding whether to pursue surgical repair of her Achilles. Tr. 536. She received Lorcet for leg pain. Tr. 538. Plaintiff testified that she had considered surgery, but that the doctors could not guarantee that the surgery would get rid of her pain. Tr. 165. As of subsequent follow up visits in 2009, she reported "0" on the 0/10 pain scale. *See, e.g.*, Tr. 542.

Insomnia/Depression

These two impairments are addressed in tandem because over the course of Plaintiff's treatment records, they were often considered within the same visit or assessment.

---

[6]    Lymphadenopathy is any disorder affecting a lymph node. STEDMAN'S MEDICAL DICTIONARY 234440 (27th ed.). The axillary lymph nodes appear under the arm. *Id.* 40350.

8

Plaintiff was treated at Southeastern Regional Mental Health Center ("SRMHC") for alcohol dependency and abuse in 1991-92,[7] and was also diagnosed with dysthymia[8] at that time. Over the course of her treatment, she reported depression and trouble sleeping, which were both successfully treated with imipramine. Tr. 87-89. Though she completed treatment in June 1992, Tr. 90, Plaintiff returned to SRHMC in May 1993, complaining of trouble sleeping and depression resulting from her separation from her husband. Tr. 91-94. The treating social worker noted that Plaintiff did not appear depressed nor anxious, and that Plaintiff was mainly seeking something to help her sleep. Tr. 95. A diagnosis of "adjustment disorder with depressed mood" was noted, *Id.*, and Plaintiff was prescribed Doxepin to help her sleep, which as of November 19, 1993, was helpful. Tr. 100-101. Plaintiff ceased treatment of her own accord in 1994. Tr. 107. From 1994 through 2002, the only records relating to Plaintiff's mental health treatment pertain to alcohol dependency and same in remission, with no depression noted. *E.g.*, Tr. 110, 114, 117.

It is in this context that Plaintiff's post-disability onset date treatment for insomnia and depression occurs. Plaintiff returned to SRMHC in April 2003. At this time, she requested something to help her sleep, but reported that she did not feel depressed and was not seeking antidepressants. Tr. 126-27. Plaintiff also stated that although she had difficulty falling asleep,

---

[7]     Though Plaintiff's asserted date of disability onset is September 4, 2002, these records are provided here as context for Plaintiff's assertions to later treatment providers.

[8]     Dysthymic disorder is a chronic type of depression lasting for at least two years, with less severe symptoms than those experienced by patients with major depression. AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 379-81 (4th ed. 2002) ("Usually Major Depressive Disorder consists of one or more discrete Major Depressive Episodes that can be distinguished from the person's usual functioning, whereas Dysthymic Disorder is characterized by chronic, less severe depressive symptoms that have been present for many years.").

once she fell asleep, she was able to sleep 6-8 hours. Tr. 126. She was referred for further assessment, and one was completed on April 22, 2003. Tr. 129. Plaintiff then reported that over the counter sleep aids were no longer helping her sleep, and reported no symptoms of depression. *Id.* The counselor who met with Plaintiff stated that "in reality . . . her sleep appears to be quite normal." Tr. 130.

Plaintiff visited the Fairmont Medical Clinic in July and September 2003 for a fractured toe and an upper respiratory infection. Tr. 332-33. She reported no other medical issues. *Id.* But one week after her respiratory infection, in September 2003, Plaintiff returned to the clinic "complaining of problems sleeping." Tr. 331. She stated that she had problems falling asleep and staying asleep "for years and took questionable antidepressants for same." *Id.* Plaintiff was prescribed Zoloft for the insomnia, but denied "feeling sad," "crying spells," and "being lonely." *Id.* Plaintiff's treating physician noted that she had no suicidal ideations, hallucinations, paranoia, flight of ideas, or psychosis. *Id.* The physician listed "insomnia" and "history of anxiety depression" in Plaintiff's assessment. *Id.*

Plaintiff returned to the clinic the following week, on September 16, for a "follow-up on insomnia." Tr. 330. She reported that the Zoloft "helped tremendously" and that she was "sleeping without difficulty and feels much better with the rest." *Id.* Plaintiff again denied crying spells, sadness, loneliness, suicidal thoughts, and hallucinations. *Id.* Plaintiff had another appointment on October 20, 2003, "for followup [sic] on anxiety depression." Tr. 329. At that time, she was sleeping without difficulty and reported that the medication was "working well," and that she had no suicidal thoughts or hallucinations. *Id.* The doctor reported that she had no difficulty concentrating. *Id.* Plaintiff was given a refill of the Zoloft prescription, but was

10

otherwise directed to return for a follow-up appointment in three months unless there were any "problems or increased symptoms." *Id.* Thus, Plaintiff did not return to the clinic until January 9, 2004, and reported at that time that she "has not had any further problems falling to sleep and does not wake up." Tr. 328. She again had no suicidal thoughts or hallucinations, and was directed to return for a check-up in three months unless she had additional problems. *Id.*

Plaintiff did not return to the clinic until May 7, 2004. Tr. 327. She reported getting 7-8 hours of sleep per night and stated that she was no longer having problems with depression or anxiety. *Id.* Plaintiff's next follow-up appointment occurred on August 13, 2004, and she again stated that she had no problems with the Zoloft and denied both mood swings and behavior changes. Tr. 326. The doctor's notes state that the Zoloft "was initially started to help patient sleep." *Id.* In November 2004, Plaintiff returned for a check-up and reported that the Zoloft was working well and that she was not feeling sad or lonely. Tr. 325.

Treatment notes from Plaintiff's next check up on February 11, 2005 again state that her mood and sleep habits were stable. Tr. 324. After a routine physical in March 2005, Tr. 322, Plaintiff returned to the clinic on June 20, 2005 for a follow-up appointment, and reported that Zoloft continued to help her sleep. Tr. 321. She denied crying spells, and reported that she did not feel sad or lonely. *Id.* At her January 11, 2006 routine check-up, Plaintiff was sleeping without difficulty, had no problems concentrating, no mood swings, and a stable mood. Tr. 320, 137. Plaintiff also stated at her May 23, 2006 follow-up appointment that she was "doing well"

with the Zoloft and "offer[ed] no other complaints." Tr. 319.  The doctor noted that Plaintiff's

depression was "stable" with the Zoloft.[9] *Id.*

Plaintiff had another follow up visit at Fairmont Medical Clinic on February 7, 2007, Tr.

134, and was referred to a sleep study for reported fatigue that was not helped by B12 injections.

Tr. 135.  Plaintiff's anxiety was again assessed as "stable with Zoloft." Tr. 133.  Plaintiff was

admitted to Southeastern Regional Medical Center for the sleep study on February 23, 2007, and

reported that she usually slept 6 hours or fewer per night. Tr. 436. Although Plaintiff reported

that she was "a little" tired and "quite a bit" sleepy, she also stated that she felt "extremely" alert.

*Id.* The sleep study revealed that  while Plaintiff had some decreased sleep efficiency and mild

periodic limb movement disorder, there was no significant evidence of sleep apnea. Tr. 439.

Plaintiff's next check-up occurred on April 20, 2007, during which Plaintiff reported that she

often felt tired and fatigued. Tr. 557. She was prescribed ReQuip to help her restless leg

syndrome. *Id.*  On August 24, 2007, Plaintiff received medication refills, again had "no

complaints," and again was assessed as "stable with Zoloft." Tr. 560.  She returned to the clinic

on December 26, 2007 and requested "something that will help her sleep," but reported that

despite some ongoing "episodes," "the Zoloft has helped her [anxiety and depression]." Tr. 562.

At that visit, no weakness or dizziness was noted. Tr. 563. She was prescribed Ambien CR to

help with her sleep difficulties. *Id.*

From over a year and a half, February 25, 2008, through September 29, 2009, Plaintiff's

medical visits—aside from treatment for her ruptured Achilles tendon, as discussed above—

---

[9]    Plaintiff during this visit also asked "questions about disability especially SSI." Tr. 319.

consisted of routine check-ups, B12 injections, and medication refills. She continually denied

any new problems or complaints. Tr. 565, 534, 536, 539-41, 543-44. The records of Plaintiff's

July 21, 2009 visit to Fairmont note "no new complaints" but report that Plaintiff's Zoloft was

increased to 100 mg instead of 50 mg daily. Tr. 545. No weakness or dizziness was noted as of

that date. *Id.*

**Medical Opinion Evidence**

Plaintiff's file is replete with both consulting and non-examining physician reports

assessing her physical and mental health during 2007 and 2008. In addition, on October 20,

2009, Mr. Kelvin Sampson, the certified physician assistant who treated Plaintiff at Fairmont

Medical Clinic, submitted a medical source statement regarding Plaintiff's ability to do physical

work-related activities after her Achilles injury. Tr. 549-554. Mr. Sampson, as the ALJ noted,

had an ongoing treatment relationship with Plaintiff, since at least May 28, 2008. Tr. 534; Tr. 19.

Mr. Sampson reported that Plaintiff was able to perform a range of activities consistent

with sedentary work. Tr. 549-54. He reported that Plaintiff could lift up to ten pounds frequently

and 11-20 pounds occasionally. Tr. 549.[10] Even taking into account Plaintiff's Achilles tendon

injury, Mr. Sampson concluded that she could sit for 8 hours, stand for 2 hours, and walk for 2

hours at one time without interruption, as well as total in an 8 hour work day. Tr. 550. He limited

---

[10]    He also reported that Plaintiff could carry as much as 20 pounds continuously, 21 to 50 pounds
frequently, and 51 to 100 pounds occasionally. *Id.* The only environmental limitation Mr. Sampson noted was
"frequent" exposure to unprotected heights; all other conditions were described as "continuous." Tr. 553. Mr.
Sampson also concluded that Plaintiff push/pull frequently, and perform handling, fingering, and feeling
continuously. Tr. 551. In addition, he indicated that Plaintiff's Achilles tendon injury limited her operation of foot
controls with her right foot to "never." *Id.* He further mentioned that Plaintiff should not lift heavy objects and
should not partake in excessive walking or running. Tr. 554.

Plaintiff to reaching occasionally, due to "frequent axillary abscesses." Tr. 551. Due to the

Achilles injury, Mr. Sampson limited Plaintiff to "never" climbing ladders or scaffolds, and

"never" crawling, but stated that she could "occasionally" climb stairs/ramps, balance, stoop,

kneel, and crouch. Tr. 522. Mr. Sampson additionally noted that Plaintiff could climb steps at a

reasonable pace and perform activities like shopping, walking a block at a reasonable pace on

uneven surfaces, taking public transportation, and preparing food. Tr. 554. Mr. Sampson did not

note any physical limitations that occurred as a result of either Plaintiff's insomnia or the

medications she was taking following the Achilles injury.

Dr. Ferriss Locklear performed a consultative physical examination of Plaintiff on

February 19, 2007 on behalf of the state Disability Determination Services. Tr. 403-406.

Plaintiff's chief complaint was "history of stab wound right chest." *Id.* She stated that she felt

soreness in her chest "all the time, especially if she is lifting or pulling." *Id.* She reported no

"other medical problems" besides needing monitoring for her cholesterol. *Id.* Plaintiff also

reported taking Zoloft nightly. Tr. 405. Dr. Locklear reported that there was no visible scarring

within the right chest wall. Tr. 406. Strength in Plaintiff's upper and lower extremities was rated

5/5, she could squat and rise, raise her arms above her head, and stand and walk on her heels and

toes. *Id.* She had a full range of motion in all respects. Tr. 403.

Dr. Morton Meltzer performed a consultative examination as to Plaintiff's mental health

complaints on February 17, 2007. Plaintiff's chief complaint was insomnia "since 1990." Tr.

420-25. She reported that the Zoloft worked, and was given to her from a family physician at a

medical clinic, without accompanying therapy. *Id.* Although Plaintiff complained that the Zoloft

had the side effect that it "gives her no energy," she took it at bedtime rather than in the morning.

*Id.* She reported no other medical issues. Tr. 422. Plaintiff told Dr. Meltzer about her work schedule as of that date, stating that she gets up at 5:30, makes herself breakfast, and reads. *Id.* She also reported that she likes to walk. *Id.* She prepares herself lunch and then later returns to work. *Id.* She also prepares supper, and she reads until bedtime. *Id.* She attends the Kingdom Hall three times a week "if she goes" and also has "many social functions involving the church." *Id.* Dr. Meltzer concluded that Plaintiff's mental status included good memory and relatively good judgment, appropriate affect, and no anxiety. *Id.* He also noted that Plaintiff was "able to concentrate." Tr. 422. He diagnosed her as "chronically dysthymic" with possible anti-social behavior, and assessed her GAF as 60. Tr. 423. Dr. Meltzer described Plaintiff as a "bright, articulate woman" who "communicates very, very well" and recommended that she would benefit from therapy and attending community college. Tr. 423-24.

Dr. Kumar reviewed Plaintiff's medical records and completed a Physical RFC Assessment on February 28, 2007. Tr. 463-470. Dr. Kumar determined that Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations. Tr. 464. Dr. Kumar concluded that there was "no objective basis for any significant work related functional loss." *Id.*

Arlene Cooke, Ph.D. completed a Psychiatric Review Technique on March 1, 2007, assessing Plaintiff's records from September 2002 to the date of review. Tr. 471-484. Dr. Cooke concluded that Plaintiff had a medically determinable somatoform disorder (insomnia) that was not severe. Tr. 471, 477, 483. Dr. Cooke additionally concluded that Plaintiff had no episodes of decompensation, and no degree of limitation in activities of daily living or in maintaining social functioning, and only mild limitation in maintaining concentration, persistence, or pace. Tr. 481.

15

Dr. Cooke noted that Plaintiff alleged anxiety and insomnia, and that she was taking Zoloft but had trouble falling asleep. Tr. 483. Dr. Cooke also stated that Plaintiff participated "almost daily" in religious related activities and was able to handle her own money and do her own shopping. *Id.*

Plaintiff again underwent a consultative examination with Dr. Locklear on November 12, 2007, following her restless leg syndrome diagnosis. Tr. 493-497. There were no range of motion abnormalities. Tr. 493, 496. Dr. Locklear noted that she had previously been evaluated "with very similar complaints." Tr. 494. Plaintiff mentioned that "with any sort of exertion, lifting, and straining, she would develop pain over the right hip," but did not report shortness of breath. *Id.* She mentioned her recent restless legs syndrome diagnosis as well as insomnia and depression, and noted that she was taking Zoloft and ReQuip. Tr. 494-95. At the time of this examination, she was working two hours per day as a bus monitor, and did the cooking and cleaning at home. *Id.* Strength in Plaintiff's upper and lower extremities was 5/5. Tr. 496. Plaintiff told Dr. Locklear that she was able to lift 5 pounds and walk without problems. Tr. 497.

On October 18, 2007, William Link, Ph.D. performed a new consultative examination regarding Plaintiff's psychological complaints. Tr. 499-502. Plaintiff reported to him that she had applied for disability the previous year and was denied, and that she had had ongoing insomnia since the age of 18. Tr. 499. She stated that she had suffered from depression since she was a child and had taken Zoloft "for years." *Id.* She reported that she was not in any form of therapy, and that she took ReQuip for the restless leg syndrome. *Id.* Plaintiff informed Dr. Link that she was treated for depression when she was 20 or 22 years old, and was treated with medication and a year of therapy. Tr. 500. Dr. Link noted that Plaintiff "tend[s] to her daughter's

16

needs when her daughter is at home," and "is able to cook, do the laundry, and other chores," and "attend[s] church on occasion." *Id.* Plaintiff also stated that she "thinks she averages less than five hours of sleep every night." *Id.* She described herself as depressed. *Id.* Dr. Link concluded that her judgment was appropriate for a work environment, and diagnosed her with major depressive disorder, and a GAF of 70. Tr. 501. He concluded that Plaintiff could understand, retain, and carry out simple instructions and was able to "maintain her attention on simple tasks." Tr. 502. He also noted that she could "relate constructively to supervisors and coworkers without difficulty." *Id.* He did not believe that "cognitive or psychological reasons" would impact her ability to handle a work environment, noting that although she was "reporting some depressive features and [was] taking Zoloft," those features did "not significantly interfere with her cognitive skills to the extent that she would not be able to handle simple tasks and relate in an appropriate manner." *Id.*

Dr. Gardner completed a Physical RFC Assessment on March 14, 2008. Tr. 503-510. A primary diagnosis of hypertension was noted, and a secondary diagnosis of restless leg syndrome. Tr. 503. Dr. Gardner concluded that Plaintiff had no exertional, manipulative, visual, or communicative limitations. Tr. 504-07. Due to Plaintiff's hypertension and restless leg syndrome, he determined that Plaintiff should "never" climb ladder/rope/scaffolds, but noted no other postural limitations. Tr. 505. The only environmental limitation that Dr. Gardner noted was that Plaintiff should avoid concentrated exposure to hazards (such as machinery or heights). Tr. 507. Dr. Gardner concluded that Plaintiff's medical records were consistent with limitations on climbing, height and hazards due to the restless leg syndrome. *Id.*

17

Dr. Charles completed a Psychiatric Review Technique on March 14, 2008. Tr. 515-528. He assessed the period from September 4, 2002 until the date of the review. Tr. 515. Unlike Dr. Cooke's review, Dr. Charles did not mention Plaintiff's insomnia, but concluded that an RFC assessment was necessary to evaluate Plaintiff's depression. Tr. 515, 518. He determined that Plaintiff had "mild" restriction of activities of daily living and in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. 525. Dr. Charles then completed the Mental RFC Assessment on the same date. Tr. 511-513. He determined that Plaintiff was "not significantly limited" in her ability to perform 15 out of the 20 listed tasks (i.e., accept and carry out detailed instructions, make plans independently of others). *Id.* He determined that Plaintiff had moderate limitations[11] in her ability to: respond appropriately to changes in the work setting; complete a normal workday and workweek without interruptions and perform at a consistent pace; perform activities within a schedule, maintain regular attendance, and be punctual; maintain attention and concentration for extended period; and understand and remember detailed instructions. *Id.* Dr. Charles then concluded that Plaintiff could "understand and remember simple 3-step directions," "sustain sufficient attention to complete simple routine tasks for a two hour period at a non-production pace," "accept direction from a supervisor and maintain adequate relationships with co-workers in work setting," and "will have some difficulty adapting to change, but will be able to function with a stable work assignment." Tr. 513. In sum, Dr. Charles stated: "claimant is capable of performing SRRTs [simple, repetitive, routine tasks], [without] undue supervision." *Id.*

---

[11]     The Mental RFC Assessment form asks the responding physician to check one of five boxes with respect to each ability: "not significantly limited," "moderately limited," "markedly limited," "no evidence of limitation in this category," and "not ratable on available evidence." *See, e.g.*, Tr. 511.

## Weight Given to Medical Opinions

The ALJ gave Mr. Sampson's medical source statement "significant weight" to the extent it was consistent with the record evidence. Tr. 20. The ALJ did, however, reject Mr. Sampson's conclusions that Plaintiff could "never" crawl or climb ladders/scaffolds, and that axillary abscesses caused Plaintiff functional limitations, as inconsistent with the evidence. *Id.* The ALJ gave "less weight" to the state agency medical consultants' (i.e., Drs. Kumar and Gardner) and Dr. Locklear's opinions regarding Plaintiff's physical limitations, because those opinions predated Plaintiff's ruptured Achilles. Tr. 20. Nonetheless, with respect to Plaintiff's other alleged limitations (which predated her Achilles injury), the ALJ gave these reports "significant weight" because they were consistent with the record. *Id.*

As to Plaintiff's mental health, the ALJ assigned "significant weight" to Dr. Meltzer's consultative opinion, particularly his recommendation for community college, because his opinion was consistent with both the evidence of Plaintiff's daily living activities and the relative lack of treatment for "allegedly disabling depression." Tr. 20. The ALJ gave "less weight" to Dr. Link[12] to extent "he [only] found her capable of understanding, retaining and carrying out simple instructions because the record does not demonstrate an inability to perform more skilled tasks." *Id.* The ALJ also gave Mr. Sampson's treatment notes regarding minimal treatment for Plaintiff's depression "great weight." Tr. 20. The ALJ did not, however, explicitly mention the weight given to the opinion of non-examining consulting psychiatrist Dr. Charles.

---

[12] The ALJ also noted that Dr. Link's meeting with claimant in November 2007 was first time she told a "treating or examining" physician that she experienced depression *despite* taking Zoloft. Tr. 20 This conclusion is consistent with Plaintiff's medical records, which, as discussed above, consistently assess her as stable with Zoloft.

19

# ANALYSIS

## I.     The ALJ Applied the Correct Legal Standards In Assigning Weight To The Opinion Evidence.

Plaintiff contends that the ALJ's decision "did not give adequate weight to the medical evidence provided by [Plaintiff's] treating physicians." DE-25-1 at 5. Plaintiff elaborates that the ALJ did not give "controlling or extra weight" to "the opinion of the treating physicians at Southeastern Regional Mental Health Center, Fairmont Medical Clinic and other sources e.g., Dr. Clifford H. Charles, Ph.D." DE-25-1 at 6 (citations to record omitted). This argument— which appears to be reprised on the following page of the brief without additional support, *see id.* at 7—suffers from several defects, which are discussed in turn below. Plaintiff additionally objects to the weight that the ALJ gave to Dr. Kumar's RFC assessment, arguing that the ALJ's decision to give "great weight" to "a non-examining medical consultant's review . . . prepared before Claimant's Achilles injury" was in error.[13] DE-25-1 at 6 (citing Tr. 465-470). This argument likewise fails.

### A. The ALJ Carefully Considered and Correctly Weighed Mr. Sampson's Treating Opinion.

As an initial matter, though Plaintiff argues that the ALJ "ignored" her treating providers' opinions, DE-25-1 at 7, the ALJ in fact gave the opinion of Mr. Sampson "significant" weight, and Mr. Sampson's Fairmont Medical Clinic records regarding Plaintiff's minimal treatment for depression "great weight." Tr. 19-20. Plaintiff's argument thus stumbles right out of the gate. It fares no better thereafter.

---

[13]     Plaintiff cites only Dr. Kumar's assessment in this objection, and not the other state agency consultants.

Although the opinion of a "treating source" may—but need not— be entitled to controlling weight[14] under the relevant regulations, 20 C.F.R. § 1527(c)(2), this deference is limited to the opinion of an "acceptable" medical source. *See* 20 C.F.R. § 404.1502. Only licensed physicians, licensed psychologists, licensed optometrists, and licensed podiatrists are defined as "acceptable medical sources," *id*. § 404.1513(a), and the opinion of a certified physician assistant such as Mr. Sampson is instead categorized as one from an "other source." 20 C.F.R. § 404.1513(d); *see also* SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Accordingly, Plaintiff is incorrect that Mr. Sampson's literal status as one who treated Plaintiff renders his opinion that of a "treating source" under the regulations. *Cf.* DE-25-1 at 6-7.

Nonetheless, the same factors that an ALJ *must* use to determine the weight to be accorded to the so-called "acceptable" medical sources "should" be used to weigh the opinions of other medical providers. SSR 06-03p, 2006 WL 2329939, at *3 ("Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."). As such, an ALJ may consider the following non-exhaustive factors in deciding the weight to give to a medical source classified as an "other" source: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship between the physician and the claimant; 3) the supportability of the physician's opinion; 4) the consistency of the opinion with the record;

---

[14]     The SSA will give controlling weight to "a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) [if it] is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).

and 5) whether the physician is a specialist. 20 C.F.R. § 404.1527(c)(1)-(6); *see also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).

The ALJ is not required to explicitly discuss each of these factors in his decision. *Warren v. Astrue*, No. 5:08-cv-149, 2009 WL 1392898, at *3 (E.D.N.C. May 18, 2009). And although an ALJ must consider opinions from "other" sources such as Mr. Sampson, as he must consider all evidence in the record, the language in SSR 06-03p regarding what must be spelled out in the ALJ's opinion is more precatory than mandatory: "the adjudicator *generally should* explain the weight given to [such opinions], *or otherwise* ensure that the discussion . . . allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06-03p (emphasis added).[15] Here, the ALJ explained the weight given to Mr. Sampson's opinion, the reasons for that weight, including the fact that Mr. Sampson was a treating provider, and the opinion's supportability with the remaining evidence in the record. Accordingly, the ALJ's determination as to the weight assigned to Mr. Sampson's opinion will not be disturbed. *See Koonce v. Apfel*, No. 98-cv-1144, 166 F.3d 1209, 1999 WL 7864, at *2 (4th Cir. 1999) (such a determination "will generally not be disturbed absent some indication that the ALJ has dredged up specious inconsistencies or has not given good reason for the weight afforded a particular opinion").

---

[15]    As a comparison, when assessing an acceptable treating source's medical opinion, the ALJ's decision must "contain specific reasons for the weight given … supported by substantial evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL 374188, at *5 (Jul. 2, 1996); *see also Farrior v. Astrue*, No. 7:10-cv-164, 2011 WL 3157173, at *4 (E.D.N.C. Jun. 1, 2011), *adopted by Farrior v. Astrue*, 2011 WL 3157150 (E.D.N.C. Jul. 26, 2011). Though the ALJ was not required to follow this standard here as to Mr. Sampson's opinion, it is noted that his explanation and analysis would have satisfied this heightened standard as well.

22

### B. Treatment Records from Southeastern Regional Mental Health Center and Fairmont Medical Clinic Are Not "Medical Opinions."

Plaintiff's argument with respect to the ALJ's purported rejection of treating source opinion evidence cites mainly medical records, and thus confuses "medical opinion" evidence—which is governed by 20 C.F.R. § 404.1527 as discussed above—with the evidence in the record more generally. "Medical opinions are statements from physicians and psychologists or other acceptable medical sources *that reflect judgments about the nature and severity of your impairment*(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2) (emphasis added).  Thus, while medical records constitute evidence that the ALJ must consider, medical records are not necessarily "medical opinion" evidence as contemplated by the regulations.  Only those statements within the records that reflect judgments regarding a claimant's prognosis or limitations, or the severity of symptoms, constitute medical opinions. *See McDonald v. Astrue*, 492 F. App'x 875, 884 (10th Cir. 2012) (*"*The treatment notes cited by [Plaintiff] do not qualify as medical opinions [because they] do not indicate any prognoses, nor do they provide opinions as to what McDonald could still do despite her impairments or the nature of her mental restrictions."); *Norris v. Barnhart*, 197 F. App'x 771, 774 n.4 (10th Cir. 2006) ("Contrary to the Commissioner's position, Dr. Hillis's records do contain "medical opinions" because he makes statements that reflect judgments about Norris's symptoms.").  Accordingly, a doctor's recording of a patient-claimant's subjective complaint "is not a 'medical opinion' entitled to any special deference."  *Valdez v. Comm'r of Social Sec.*, 2013 WL 3013668 (E.D. Mich. Jun. 18, 2013) (rejecting Plaintiff's argument that the "ALJ should have credited [a treating source's] statement that he had "'some cognitive problems with memory and difficulty spelling, somewhat worse

recently'"). Thus, the records cited by Plaintiff, in and of themselves, are not "opinions" entitled to "controlling" or special weight simply because the source of the medical records treated Plaintiff. Indeed, medical records are, *ipso facto*, generated upon treatment, and the rule as Plaintiff apparently views it would give every medical record controlling weight.

At any rate, Plaintiff fails to point to specific opinions— i.e., judgments about the nature and severity of her impairments—within these medical records that she contends contradict the ALJ's position. Nor do the records cited by Plaintiff support her conclusion: they merely note her diagnosis or "past history," occasionally record Plaintiff's reported lack of sleep, and conclude that she was generally stable with her Zoloft prescription. *See, e.g.*, Tr. 319 ("Stable with Zoloft … she will continue this and follow up in 6 months"); Tr. 321 ("Plaintiff initially started Zoloft to help her sleep and she has been sleeping."); Tr. 325 ("Patient states that the medication continues to work well."); Tr. 560 ("stable with Zoloft"). What few physician observations that could constitute judgments regarding the severity of her symptoms likewise do not support her point. *E.g.*, Tr. 95 ("She does not appear depressed nor anxious."); Tr. 127 ("She does not appear depressed."). Finally, while Plaintiff's medical records routinely mention her prior diagnoses, the fact of diagnosis merely establishes the existence of a medically determinable impairment and does not establish whether or not the impairment is severe, let alone disabling. *See Aytch v. Astrue*, 686 F. Supp. 2d 590, 598-99 (E.D.N.C. 2010) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)); *see also Mecimore v. Astrue*, No. 5:10-CV-64, 2010 WL 7281096, at *5 (W.D.N.C. Dec. 10, 2010) (evidence of diagnosis does not establish disability and is not tantamount to evidence showing functional limitations stemming from the diagnosed impairment).

24

Contrary to Plaintiff's contention that the ALJ "ignored" whatever opinions were couched in the records of her treating providers, the ALJ thoroughly considered all medical records set before him and discussed them in support of his conclusions. And as discussed above, the ALJ gave much consideration and weight to Mr. Sampson's opinion, taking his treatment relationship with Plaintiff into account. This Court will not re-weigh the evidence or substitute its judgment for that of the Secretary. *See Craig*, 76 F.3d at 589. The ALJ applied the correct legal standards and substantial evidence supports his findings. Accordingly, Plaintiff's assignment of error with respect to the ALJ's analysis of the medical records has no merit.

### C. The ALJ Correctly Weighed The Non-Examining State Agency Consultants' Opinions, But Failed To Discuss Dr. Charles' Opinion.

As discussed above, Plaintiff makes two distinct arguments relating to the opinions of state agency consultants. She argues that the ALJ erroneously did not give weight to Dr. Charles' opinion, *see* Tr. 511-528, and that the ALJ should not have given great weight to Dr. Kumar's opinion. DE-25-1 at 6-7, 9-10; *see also* Tr. 463-470. The same legal standard applies to both opinions.

"RFC assessments by State agency medical . . . consultants . . . are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairments," SSR 96-6p, 1996 WL 374180, at * 4 (Jul. 2, 1996), because such consultants are "highly qualified" and "are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i). The ALJ must explain the weight given to the consultant in his written decision. *Id.* § 404.1527(e)(2)(ii). In evaluating RFC assessments prepared by state consultants, the ALJ follows the same process that applies to any opinion evidence, considering factors such as "the supporting evidence in the case record." *See id.* §

404.1527(a)-(d). The opinion of a non-examining physician such as a state agency medical consultant can therefore be given significant weight so long as it is consistent with the record. *Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005). As a corollary to this proposition, a non-examining physician's opinion is entitled to weight only to the extent his opinion is consistent with the rest of the record. *See* 20 C.F.R. § 404.1527(e)(2); *Mathis v. Shalala*, 890 F. Supp. 461, 463 (E.D.N.C. 1995).

Plaintiff's assignment of error regarding the weight given to Dr. Kumar's assessment is based upon the fact that Dr. Kumar's assessment pre-dated Plaintiff's ruptured Achilles.[16] DE-25-1 at 6. But the ALJ expressly stated that the findings of the state agency consultants— including Dr. Kumar— were given less weight "because their assessments did not consider the claimant's ruptured Achilles tendon [which occurred] after their assessments." Tr. 20. The ALJ only gave weight to those portions of the opinions relating to Plaintiff's other impairments, and only because they were "consistent with the record as a whole." Tr. 20. *See* SSR 96-6p ("[T]he opinions of State agency medical … consultants . . . can be given weight only insofar as they are supported by evidence in the case record . . . *including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency*.") (emphasis added). The ALJ must consider whether subsequent evidence supports the state agency medical consultant's determination, 20 C.F.R. § 404.1527, and the ALJ did so here. The weight given to Dr. Kumar's opinion was proper. *See Johnson*, 434 F.3d at 657.

---

[16] Plaintiff argues that she "has moderate limitations based on the medical consultant reviews after her injury," which is incorrect. DE-25-1 at 6. The only reviews performed after her Achilles injury were that of Dr. Charles, who assessed only Plaintiff's mental health (and thus did not take into account physical limitations due to the injury), and Mr. Sampson, who did not mention any "moderate" limitations not taken into account by the ALJ.

As to Dr. Charles' opinion, the ALJ failed to explain the weight given to it in his written decision, as required by 20 C.F.R. § 404.1527(e)(2)(ii). Although the ALJ generally addressed the weight given to the state agency consultants, it appears from the context that his statement in that regard was directed to the consulting and non-examining opinions regarding Plaintiff's physical disabilities, rather than her alleged mental disabilities. *See* Tr. at 20. The ALJ discusses Dr. Link and Dr. Meltzer's consultative examinations in detail with respect to Plaintiff's depression, Tr. 17, but fails to mention Dr. Charles' March 2008 non-examining assessment at all, nor the weight he gave it. Although this was error, as discussed below, given the substantial evidence in the record to support the ALJ's overall conclusions regarding the non-severity of Plaintiff's depression and the lack of evidence in the record regarding functional limitations caused by Plaintiff's depression, the error was harmless.[17]

### D. The ALJ's Failure to Expressly State The Weight Given to Dr. Charles' Opinion Was Harmless Error.

"Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error." *Austin v. Astrue*, No. 7:06-cv-622, 2007 WL 3070601, at *6 (W.D. Va. 2007) (citing *Camp v. Massanari*, 22 F. App'x 311 (4th Cir. 2001)). Here, it is inconceivable that the ALJ would have reached a different conclusion even had he incorporated Dr. Charles' opinion into the analysis, because Dr. Charles' opinion is inconsistent with the rest of the record. *See* 20. C.F.R. § 404.1527(e)(2).

---

[17] Dr. Charles' opinion assesses only Plaintiff's depression and does not consider her insomnia. *See* Tr. 511-28. Accordingly, this error would only have affected the ALJ's decision with respect to any limitations caused by Plaintiff's depression.

27

First, Plaintiff's description of Dr. Charles' conclusions is misleading. Plaintiff contends

that Dr. Charles "concluded that she was moderately limited in her ability to perform gainful

work activity." DE 25-1 at 10.[18] That is not at all what either Dr. Charles' RFC Assessment or

the Psychiatric Review Technique ("PRT") states.  Dr. Charles stated on the PRT that Plaintiff

had only mild limitation in activities of daily living and in maintaining social functioning, though

he did state that she had moderate difficulties in maintaining concentration, persistence, or pace.

Tr. 525. Nonetheless, the RFC Assessment prepared by Dr. Charles evaluated Plaintiff's

limitations across twenty functional areas and concluded that Plaintiff was "not significantly

limited" in the vast majority of those categories. Tr. 511-512; *see also supra* at 18.  Plaintiff

cherry picks those few items which Dr. Charles identified as causing "moderate" limitations, and

attempts to label them the overall conclusion. On the contrary, Dr. Charles concluded that

Plaintiff could "understand and remember simple instructions," "accept direction from a

supervisor and maintain adequate relationships with co-workers," and "function with a stable

work assignment." Tr. 513.  All of those conclusions are consistent with an impairment that is

non-severe. *See* 20 C.F.R. § 404.1521.  And to the extent that Dr. Charles' opinion found slightly

greater limitations in functioning than did the other state agency consultants, his opinion is not

consistent with the other evidence in the record.

The ALJ considered and discussed in his decision the consultative opinions of Dr. Link

and Dr. Meltzer, who both examined Plaintiff, and gave "significant weight" to the latter due to

---

[18]     This argument appears in a section that purportedly argues that the ALJ erroneously substituted
his opinion for that of a doctor. DE-25-1 at 9 ("Medical Opinion by ALJ"). But the argument really comes down to
Plaintiff's disagreement with the ALJ's conclusion regarding the evidence in the record (or lack thereof) regarding
limitations caused by Plainitff's depression, and the ALJ's failure to credit Dr. Charles' opinion in this regard. *See
id.* at 10.

its consistency with the record. Tr. 17, 20. The ALJ also reviewed Plaintiff's testimony and the record evidence, determining that Plaintiff's depression did not hinder her in working as a bus monitor or caring for her daughter, and noting that she had not sought more intensive treatment. *Id.* The ALJ carefully considered Mr. Sampson's treatment notes and gave them "great weight," along with notes prepared by Aundrea Avila, FNP, another treating provider, assessing Plaintiff's mood and condition as stable. Tr. 17, 20. As discussed below, substantial evidence supports the ALJ's conclusion that the depression was non-severe, and that it did not in combination with other impairments cause functional limitations inconsistent with an inability to perform sedentary work. *See* 20 C.F.R. § 1521(a). As such, his failure to explicitly discuss Dr. Charles' opinion and his reasons for discounting it is harmless error. *See Yuengal v. Astrue*, No. 4:10-cv-42-FL, 2010 WL 5589102, at \*9 (E.D.N.C. Dec. 17, 2010) (because substantial evidence existed supporting ALJ's determination that claimant was capable of working, and ALJ fully explained reasons for reaching conclusion and considered other opinion testimony, failure to explicitly consider even a treating physician's opinion was harmless error).

## II. <u>Substantial Evidence Supported The ALJ's Conclusion that Plaintiff's Depression Was "Non-Severe."</u>

Plaintiff contends that the ALJ erroneously concluded that her depression was non-severe, arguing that the ALJ's decision was "contrary to the records." DE-25-1 at 9.[19] In his decision, the ALJ concluded Plaintiff's medically determinable impairment of depression did not

---

[19] Plaintiff also reprises this argument in the "Medical Opinion by ALJ" section of the brief. DE-25-1 at 9. The "opinion" Plaintiff points to is the ALJ's statement that "there was a lack of treatment Claimant received for her allegedly [sic] depression." *Id.* This neither an accurate description of the ALJ's conclusion, as stated above, nor a medical opinion. Rather, the ALJ's conclusion was a judgment of what the medical records reflect.

cause more than minimal limitation in her ability to perform basic mental work activities. Tr. 17.

Specifically, the ALJ found that:

> [Plaintiff's] medical records do not indicate any complaints of depression or anxiety between September 2002, the alleged onset date, and September 2003. The record reveals she started taking Zoloft when she experienced insomnia, yet she denied feeling sad, lonely, or having crying spells at this time. In May 2004 she reported that she no longer had problems with depression or anxiety. She continued to report stability on Zoloft for years (Exhibit 1F). She did not report depression or anxiety to Dr. Morton Meltzer, the psychological consultant, in February 2007. He assessed only chronic dysthymia and possible antisocial behavior (Exhibit 6F). *Other than a prescription for Zoloft* from her primary care provider, Plaintiff has not sought psychiatric treatment[20] for her alleged depression or anxiety ….
>
> [C]laimant told Dr. William Link [after being denied benefits initially] that she had suffered from depression ever since she was a child. This is inconsistent with her treatment records. . . . [Dr. Link] concluded the claimant had major depressive disorder, but noted that the primary reason she would not be able to handle work was more related to a medical rather than cognitive or psychological reason. Dr. Link further stated that she reported some depressive features but these features did not significantly interfere with her cognitive skills. . . . While Mr. Sampson's records from 2008 and 2009 list depression among her diagnoses, there were no complaints of depression until March 2009. Moreover, Aundrea Avila, FNP noted the claimant had appropriate judgment, mood and affect as well as normal memory in June 2009.

*Id.* (emphasis added). As discussed below, these findings are supported by substantial evidence.

An impairment is considered severe within the meaning of the regulations only if it "significantly limits ... [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Conversely, an impairment is not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have

---

[20]   Plaintiff argues that she has been treated for depression "beginning in 1993 until present time." DE-25-1 at 9. As the summary of the evidence above shows, this is not strictly accurate. Moreover, the ALJ is here considering what treatment Plaintiff has sought since her alleged disability onset date.

no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered." SSR 85-28, 1985 WL 56856, at *3 (Nov. 15, 1985); 20 C.F.R. § 404.1521(a).  In evaluating the severity of mental impairments, the ALJ is required to apply the "special technique" set forward in 20 C.F.R. § 404.1520a.  The ALJ must first determine whether a claimant has a medically determinable mental impairment, and if so, assess the degree of functional limitation resulting from that impairment.[21] This technique requires the ALJ to consider and rate the claimant's limitations in four functional areas: (1) activities of daily living, (2) social functioning, (3) concentration, persistence, or pace, and (4) episodes of decompensation. *Id.* § 404.1520a(c)(3).  The first three functional areas are rated on a five-point scale: none, mild, moderate, marked, and extreme. *Id* § 404.1520a(c)(4). A four-point scale is used to rate the fourth functional area: none, one or two, three, and four or more. *Id.*

In addition to assessing the evidence discussed above, the ALJ applied the special technique and found as follows:

> The first functional area is activities of daily living. In this area, the claimant has no limitation. She reported to Dr. Meltzer that her typical day involved waking at 5:30 in the morning, making herself breakfast, and then going to work for two hours.  She has worked 5 days a week during the school calendar year since 2003 as a bus monitor,[22] and this shift lasts approximately 2.8 hours per day (Exhibit 10E). She also reported reading, preparing dinner, and caring for her developmentally disabled 19 year-old daughter with Down syndrome. (Exhibit 6F).

---

[21]     As mentioned above, the fact of diagnosis merely establishes that a medically determinable impairment exists, and says nothing about whether the impairment is "severe." *Aytch,* 686 F. Supp. 2d at 599.

[22]     The ALJ is here summarizing Plaintiff's comments to Dr. Meltzer. As noted above, and as reflected in the ALJ's decision, Tr. 15, Plaintiff stopped working as a bus monitor in 2009.

The next functional area is social functioning. In this area, the claimant has mild limitation. The claimant told Dr. Meltzer that she went to church at Kingdom Hall every Saturday morning and Thursday evenings. She indicated they had many social functions at the church (Exhibit 6F).

The third functional area is concentration, persistence, or pace. In this area, the claimant has mild limitation. She alleges depression and insomnia, yet she has worked for many years in a position monitoring school-age children in addition to taking care of her own developmentally disabled daughter who presumably requires more care and attention than most children.[23] She also reported spending much of her day reading, suggesting that her ability to concentrate is not moderately impaired (Exhibit 6F).

The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.

Tr. 17-18. Based on his findings that Plaintiff's depression caused no more than "mild" limitations in the first three functional areas, and "no" episodes of decompensation, the ALJ found that Plaintiff's medically determinable mental impairment was non-severe. *See* 20 C.F.R. § 404.1520a(d)(1).

An ALJ's written decision applying the technique "must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." *Id*. § 404.1520a(e)(4). The ALJ will also consider how a claimant's "functioning may be affected by factors including . . . medication, and other treatment." 20 C.F.R. § 404.1520a(c)(1).

---

[23] Plaintiff argues that this is an "improper[] presum[ption]." DE-25-1 at 9. The ALJ was not callously denigrating Plaintiff's daughter's abilities, but rather describing his review of the record. Plaintiff told Dr. Link that she "will tend to her daughter's needs when her daughter is at home," which is not necessarily typical for a 17-year old child. *See* Tr. 500.

The ALJ conducted an in-depth examination and analysis of Plaintiff's mental health records, including her treatment history and the reports of two consultative examiners. Plaintiff points to no specific evidence which contradicts the ALJ's findings regarding the severity of her depression, instead referring obliquely to "reports" of several named doctors (some of whom treated Plaintiff only for her Achilles injury). DE-25-1 at 9. *See Pendley v. Astrue*, No. 1:11-cv-309, 2013 WL 819337, at *5 (W.D.N.C. March 6, 2013) ("Plaintiff, who carries the burden through Step 4, has failed to show objective medical evidence that a condition . . . caused more than a minimal effect on his ability to function.").

As is both evident from the facts and aptly summarized in the ALJ's findings, Plaintiff's medical records with respect to her depression are generally routine primary care reports noting medication management for a prior diagnosis. Plaintiff routinely stated that the Zoloft helped her, and did not report side effects, symptoms of depression, or other related complaints, aside from at times seeking improved medicine for her insomnia. She did not seek therapy to complement the Zoloft, which was originally prescribed for her insomnia, not depression, Tr. 326, 330, and simply reported back to the clinic for refills. In addition, Plaintiff's self-reports in her testimony and to the consultative examiners show a level of activity inconsistent with a severe mental disability, as the ALJ discussed. Dr. Link and Dr. Meltzer, the consultative examiners who met with Plaintiff, both reached conclusions consistent with a non-severe impairment and made no findings that plaintiff's depression limited her work activities. Tr. 502, 422-24. Though Dr. Charles' non-examining review of the records concluded that Plaintiff had a handful of moderate limitations, Tr. 511-513, his opinion in that regard is inconsistent with the

remaining evidence in the record. And even Dr. Charles' ultimate conclusions were consistent with a non-severe impairment, as discussed above.

In sum, Plaintiff forecasts no evidence contradicting the ALJ's findings and again simply requests that this Court re-weigh the evidence in her favor. Because the medical records and other evidence provide substantial evidence in support of the ALJ's conclusion that Plaintiff's depression was non-severe, his conclusion will not be disturbed.

III. **The ALJ's Determination Regarding Plaintiff's RFC To Perform Sedentary Work Is Supported By Substantial Evidence.**

Plaintiff's objections to the ALJ's RFC determinations are twofold. First, Plaintiff argues that the ALJ incorrectly discounted her testimony regarding the limiting effects of her impairments. DE-25-1 at 8. Second, Plaintiff argues the ALJ erroneously failed to take into account limitations caused by Plaintiff's depression and other impairments the ALJ found to be non-severe. DE-25-1 at 7, 10.

A. **The ALJ's Assessment of Plaintiff's Credibility With Respect to the Limiting Effects of her Pain and Other Symptoms Was Supported By Substantial Evidence.**

Where a claimant makes subjective assertions of pain or other disabling symptoms, the ALJ applies a two-step process. *Craig*, 76 F.3d at 594. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting 20 C.F.R. § 404.1529(b)) (emphasis omitted). Second,

> [i]t is only *after* a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's

34

> pain, and the extent to which it affects her ability to work, must be
> evaluated.

*Id.* at 595. At this second step, the ALJ considers "the entire case record, including the objective medical evidence, the individual's own statements . . . and any other relevant evidence in the case record." SSR 96-7p, 1996 WL 374186, at \*4 (Jul. 2, 1996). Because "symptoms [can] sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," all other information about symptoms, including statements of the claimant, must be "carefully consider[ed]" in the second part of the evaluation. 20 C.F.R. § 404.1529(c)(3). The extent to which a claimant's statements about symptoms can be relied upon as probative evidence in determining whether the claimant is disabled depends on the credibility of the statements. SSR 96-7p. "Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence." *Craig*, 76 F.3d at 595.

"[B]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). An ALJ's credibility determination therefore "should be accepted by the reviewing court absent exceptional circumstances." *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (quoting *NLRB v. Air Products & Chemicals, Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)); *see also Meadows v. Astrue*, No. 5:11-cv-63, 2012 WL 3542536, at \*9 (W.D. Va. Aug. 15, 2012) (upholding ALJ's credibility determinations where they were neither unreasonable nor contradicted by other findings).

35

After reviewing the medical records and Plaintiff's testimony, the ALJ found as follows:

> [T]he claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Tr. 19. In particular, the ALJ made the following findings regarding the inconsistency between Plaintiff's testimony and the medical records:

> In terms of the claimant's ruptured Achilles tendon, the record shows that she is not disabled from performing all levels of work. Kelvin Sampson, her treating healthcare provider . . . indicated that despite her ruptured right Achilles tendon, the claimant can still sit 8 hours, stand 2 hours and walk 2 hours at one time in an 8-hour workday. He stated that she could occasionally climb stairs and ramps, balance, stoop, kneel, and crouch, and that she could never climb ladders/scaffolds and crawl (Exhibit 20F). These functional limitations are not illustrative of a totally disabled individual and are supportive of sedentary work.
>
> The claimant has further alleged dizziness and fatigue as side-effects of her medication. "Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations." *Burns v. Barnhard*, 312 F.3d 113, 131 (3d Cir. 2002) (quoted in *Johnson v. Barnhard*, 434 F.3d 650, 658 (4th Cir. 2005)). The record does not reveal any such serious functional limitations.
>
> Furthermore, the claimant has described daily activities which are not limited to the extent one would expect, given [her testimony regarding her symptoms and limitations]. [S]he worked up until at least the fourth quarter of 2009 as a bus monitor, despite rupturing her Achilles tendon in the spring of 2008. She therefore worked for at least one year with the injury performing a part-time job that was light in exertion . . . . Although this work activity did not constitute substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported. She is also able to care for her daughter with Down syndrome, performs the household chores including laundry, cooking, and cleaning, and has reported attending church up to two times per week in addition to many social activities provided by the church. (Exhibit 6F). Moreover, the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. The treatment she has

36

received has been essentially routine and conservative in nature; most appointments were checkups to receive medication refills.

Tr. 19-20 (internal citations omitted). Plaintiff argues that:

> The ALJ concluded that Claimant's testimony related to her other symptoms was not credible because the other symptoms e.g. depression, restless leg syndrome, chest wall pain impose limitations or restrictions on Claimant because she had worked part-time was consistent with sedentary work.

DE-25-1 at 8.[24] Plaintiff appears to be objecting to the ALJ's finding that Plaintiff's prior part-time work, while not substantial gainful activity, is inconsistent with her testimony regarding the limiting effects of her symptoms. But even if prior part-time work does not rise to the level of "substantial gainful activity," the ALJ may still consider whether the work performed demonstrates that a claimant is able to do more work than he or she is alleging. 20 C.F.R. § 404.1571(a); *see also Blair v. Astrue*, No. 5:10-cv-112, 2012 WL 625001, at *4 (W.D. Va. Feb. 24, 2012) (collecting cases explicitly condoning ALJ's consideration of prior non-SGA work in credibility determinations regarding what a claimant reports he or she can do). The ALJ's consideration of Plaintiff's part-time work as a bus monitor was therefore not in error.

Aside from this complaint, Plaintiff does not list any specific errors which the ALJ allegedly made in assessing Plaintiff's credibility and discounting her testimony, but merely argues that the ALJ's conclusion was incorrect. *See Mecimore*, 2010 WL 7281096, at *6 ("Plaintiff has not adduced any evidence that she experiences greater limitations than those assessed by the ALJ"). The ALJ applied the correct legal standard, and substantial evidence

---

[24] *Cf.* note 3, *supra*.

supports his conclusion. His assessment of Plaintiff's credibility is entitled to great weight, and

this Court will not disturb it. *Shively*, 739 F.2d at 989.

### B. The ALJ's RFC Determination Is Supported By Substantial Evidence.

While Plaintiff's severity argument focuses on attacking the ALJ's conclusion regarding

the severity of depression, Plaintiff also contends that the ALJ erred because the ALJ did not

include Plaintiff's other "relevant severe impairments"—specifically, insomnia and restless leg

syndrome—in his determination of Plaintiff's RFC. DE-25-1 at 7, 10. Plaintiff's argument as to

the RFC determination, without identifying specific evidence that the ALJ misstated or neglected

to discuss, summarily concludes that:

> the ALJ erroneously failed to adequately and accurately conclude [*sic*] all
> of the Claimant's limitations and restrictions, as well as all her
> impairments, in deciding that Claimant retain [*sic*] the capacity to make
> adjustments to work. In this case, the ALJ did not explain his reasoning
> for not including the pertinent evidence of all Claimant's impairments and
> limitations in the record in making his residual functional capacity
> determination that Plaintiff could make adjustments to perform light
> work.[25]

DE-25-1 at 10-11. Here, the record is bereft of evidence reflecting limitations inconsistent with

sedentary work. Plaintiff does not identify any such limitations in her brief; she simply asks this

Court to reject the ALJ's decision by offering the conclusory statement that the ALJ "failed to

consider" or "disregarded" limitations.

The ALJ's RFC "evaluation need only include a narrative discussion describing how

medical and non-medical evidence support the ALJ's conclusion." *Horton v. Commissioner,*

*Social Sec. Admin.*, No. SAG-12-1940, 2013 WL 1953328, at *2 (D.Md. May 9, 2013) (citation

---

[25] This is presumably a typo, because ALJ found that Plaintiff could perform *sedentary* work, not light work.

omitted).  Here, the ALJ did precisely that, and considered Plaintiff's non-severe impairments as

required by 20 C.F.R. § 404.1523.  Even though he determined that Plaintiff's depression was

non-severe, the ALJ took it into account in his RFC determination, reviewing consultative

opinions and medical records from Plaintiff's treating physician.  Tr. 20. Each of these opinions

was consistent with sedentary work. The ALJ also considered Plaintiff's abscesses, insomnia,

and medication side effects when determining Plaintiff's RFC, and gave significant weight to the

medical consultants' opinions regarding Plaintiff's non-severe impairments. Tr. 19. Moreover,

the ALJ concluded that while Plaintiff had been at times diagnosed with anemia, hyperlipidemia,

B12 deficiency, and restless leg syndrome, there was no indication in the record that those

impairments "have imposed even slight limitations on the claimant's ability to perform work-

related functions." Tr. 16.

     In short, the ALJ conducted a thorough summary of the entire medical record and his

RFC findings were supported by citations to that record.  The undersigned finds no reversible

error in the ALJ's assessment and consideration of Plaintiff's credibility or functional

limitations. The records in this case provide "more than a scintilla of evidence," *Laws*, 368 F.2d

at 642, in support of the ALJ's finding that Plaintiff retained the residual functional capacity to

perform sedentary work. Accordingly, Plaintiff's assignment of error is without merit.

### IV.    <u>The Hypotheticals The ALJ Posed to the Vocational Expert Were Proper.</u>

     Though Plaintiff  takes issue with the hypotheticals posed to the vocational expert, it is

apparent that Plaintiff's underlying complaint is not that the hypotheticals were improper in

form, but rather that the ALJ's purported failure to account for all of Plaintiff's impairments and

limitations tainted the questions as posed to the ALJ.  DE-25-1 at 10-11.

39

The ALJ is required only to "pose those [hypothetical questions] that are based on substantial evidence and accurately reflect the plaintiff's limitations." *France v. Apfel*, 87 F. Supp. 2d 484, 490 (D. Md. 2000); *see also Kearse v. Massanari*, 73 F. App'x 601, 604 (4th Cir. 2003). Here, the hypothetical questions posed to the VE by the ALJ were based on a RFC determination supported by substantial evidence—as discussed above—and therefore accurately reflected all of Plaintiff's limitations. In fact, the ALJ incorporated a "mild limitation on attention, concentration, understanding and remembering" into his questioning of the vocational expert. Tr. 176-77. This assignment of error is without merit.

## CONCLUSION

For the aforementioned reasons, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings (DE-25) be DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-32) be GRANTED, and that the final decision by Defendant be AFFIRMED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Friday, August 30, 2013.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE